**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

U.S. DISTRICT COURT - N.D. OF N.Y.

FILED

MAY 23 2017

AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

Julie Featherstone Plaintiff(s)

vs.

Cornell University Defendant(s)

Civil Case No.: 3:17-CV-565 (MAD/DEP)

**CIVIL COMPLAINT**
**PURSUANT TO**
**TITLE VII OF THE**
**CIVIL RIGHTS ACT,**
**AS AMENDED**

Plaintiff(s) demand(s) a trial by: ☒ JURY    ☐ COURT    (Select **only** one).

### JURISDICTION

1.   Jurisdiction is conferred on this court pursuant to 42 U.S.C. § 2000e-5, and 29 U.S.C. § 206(d)

### PARTIES

2.   Plaintiff: Julie Featherstone

Address: 1374 Stone Creek Ln. #108

Charlottesville, Va. 22902

Additional Plaintiffs may be added on a separate sheet of paper.

3.   a.   Defendant: Cornell University

Official Position: Office of University Counsel

Address: 300 CCC Building

235 Garden Ave

Ithaca, NY 14853

    b.      Defendant: _____

              Official Position: _____

              Address: _____

                                 _____

                                 _____

4.     This action is brought pursuant to:

        [X]  Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.
              § 2000e *et seq.,* and the Civil Rights Act of 1991, for employment discrimination
              based on race, color, religion, sex or national origin.

        [ ]  Pregnancy Discrimination Act of 1978, codified at 42 U.S.C. § 2000e(k), as
              amended, Civil Rights Act of 1964, and the Civil Rights Act of 1991, for
              employment discrimination based on pregnancy.

        [X]  Equal Pay Act of 1963 29 U.S.C. § 206(d)

5.     Venue is invoked pursuant to 28 U.S.C. s 1391.

6.     Defendant's conduct is discriminatory with respect to the following (check all that apply):

        (A)   [ ]  My race or color.
        (B)   [ ]  My religion.
        (C)   [X]  My sex (or sexual harassment).
        (D)   [ ]  My national origin.
        (E)   [ ]  My pregnancy.
        (F)   [ ]  Other: _____.

7.     The conduct complained of in this action involves:

        (A)   [ ]  Failure to employ.
        (B)   [ ]  Termination of employment.
        (C)   [X]  Failure to promote.
        (D)   [X]  Unequal terms and conditions of employment.
        (E)   [ ]  Reduction in wages.
        (F)   [X]  Retaliation.
        (G)   [X]  Other acts as specified below:

            E) hostile work environment for women

            F) unequal compensation for women

8.                                          **FACTS**

      Set forth the facts of your case which substantiate your claims.  List the events in the order they happened, naming defendants involved, dates and places.

**Note: You must include allegations of wrongful conduct as to EACH and EVERY defendant in your complaint.**  (You may use additional sheets as necessary).

See attached

9.                                    **CAUSES OF ACTION**

**Note: You must clearly state each cause of action you assert in this lawsuit.**

**FIRST CAUSE OF ACTION**

See attached

## SECOND CAUSE OF ACTION

see attached

## THIRD CAUSE OF ACTION

See attached

10. I filed charges with the New York State Division on Human Rights, the New York City Commission on Human Rights or Equal Employment Opportunity Commission regarding the alleged discriminatory acts on or about: (copy attached)

July 21, 2016
(Provide Date)

11. The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter **(copy attached)** which was received by me on or about:

February 27, 2017
(Provide Date)

12. The plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

13. The defendant(s) is (are) an employer, employment agency, or labor organization within the meaning of 42 U.S.C. § 2000e(b), (c), or (d).

14. The defendant(s) is (are) engaged in commerce within the meaning of 42 U.S.C. § 2000e(g).

15.   **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff(s) request(s) that this Court grant the following relief:

See attached

I declare under penalty of perjury that the foregoing is true and correct.

DATED:   5·21·17

Signature of Plaintiff(s)
(all Plaintiffs must sign)

02/2010

**FACTS:**

1. I am a female who opposed gender discrimination at Cornell University's Division of Alumni Affairs & Development (AAD) where I worked for 11 years. Because of this, I have been subject to retaliation for opposing gender discrimination.

2. From 2012 to 2016 and on repeated occasions I complained both informally and formally about gender discrimination, unequal pay of women, hostile work environment and harassment directed toward me and other other women in my workplace over a number of years.

3. I served Cornell as the Senior Director of Administration under the leadership and supervision of Richard Banks, Associate Vice President of Administration and under leadership of James Mazza, Associate Vice President of Alumni Affairs, who I collaborated with often.

4. In my role, I was one of just four individuals (and the only woman) out of approximately 350 staff in the division who was privy to all salary, promotion, and compensation decisions as well as the decision making behind the provisioning of budget resources, tools, and office space to staff throughout the Division.

5. My supervisor, Banks was the Senior Financial Officer (SFO) for the Division and had been delegated authority for all budget allocation and expense approval, technology resources, and human resources for the Division. This included the explicit authority to approve all hiring, compensation, and promotion decisions. As evidence of this, the VP of AAD from 2006-2015 attended only one internal budget strategy meeting, and delegated his responsibility for expenditure allocations and approvals to Banks, which included approving all hiring costs.

6. The discriminatory behavior and gender bias decision making by Banks and Mazza escalated after each were promoted to Assistant Vice President when their authority and decisions were not to be questioned by subordinate staff.

7. I was a Senior Director serving in the Program Director leadership cohort (approximately 25 central AAD leaders reporting directly to one of 6 Associate VPs, including Banks and Mazza). In this role, I had a demonstrable record of success stewarding Cornell's resources and leading a high performing team. I had more and higher ranked direct reports than any other Program Director in the Division and successfully managed multiple reporting, finance, policy, and training, and technology-related programs.

8. I was known throughout AAD and the University for developing smart business processes and saving Cornell significant resources, so much so that this was highlighted twice in the Cornell Chronicle.

9. My performance was rated in the top 5% of the organization for a decade by Banks. I have no record of any HR issue, write-up, warning, counseling, nor was I ever made aware that anyone had reported any such conflict

10. I have had formal and widely scoped anonymous 360-degree feedback from more than 45 colleagues, supervisors, peers, and subordinates across Cornell during my tenure, specifically in May 2006, August 2011,

1

and January 2016. In all accounts I have received exemplary feedback that confirms I was an above average and outstanding performer and colleague at Cornell.

11. As part of my position responsibilities, I budgeted and tracked compensation, promotions, position and responsibility changes (organization chart), tool /resource allocation, oversight of workspace moves, staff training opportunities, and implemented decisions made or informed by Banks, Mazza and other leaders.

12. Analysis was a routine part of my work, which included knowing, comparing and contrasting compensation and promotion decisions, and when doing so, I noted repeated examples and a consistent trend of gender inequity and unequal compensation and promotion of women.

13. Cornell's own data submitted to NYS Division of Human Rights/EEOC in December 2016 confirms gross gender inequities in pay. As part of the DHR/EEOC investigation, Cornell provided 2015 and 2016 gender and compensation information for its highest tier employees to DHR/EEOC (H band and I band). Based on that data provided by Cornell, AAD is comprised of approximately 75% females and 25% males; however, the ratios are completely opposite the higher the position in the organizational hierarchy. The highest paid positions are held by men at all levels and the lowest paid positions in all of these datasets were women, at all levels. This is consistent with my observations in my role as Senior Director over many years.

14. Based on the data provided by Cornell for 2015-2016, women were paid on average 10-15% less than men in the H band (my position), and as much as 30% in the I band. At the senior leadership level in 2015, the senior team was comprised of six men and one woman and remained that way until after my complaint was filed with Cornell.

15. One of the women who complained in November 2015 to then interim VP Jeffrey McCarthy, Kristen Ford who is now the AVP for Colleges & Units, was promoted twice after I filed my complaint with WPLR in November 2015. Ford was named specifically in my complaint as one of many examples of unequal pay of women compared to her male counterparts and she was also a victim of Banks' and Mazza's hostile work environment harassment. Ford provided this information to Cornell investigators and leadership.

16. The impact of Banks' and Mazza's decisions created unequal workplace for women versus their male counterparts which was further confirmed when I fielded complaints and concerns about hostile environment harassment and unequal treatment by other female employees for more than a decade at Cornell. For example, on October 8, 2015 after meeting with VP McCarthy and formalizing my complaint about Banks and Mazza with him, I returned to my office. A female colleague, Brenda Rodriguez came to my office to talk confidentially about the the relocation of her staff requested by Banks, and specifically about how Banks was unwilling to ask two male program directors to relocated and had instead offered several women's offices who could relocate, all of which were female staff members who reported to me.

Rodriguez was upset by Banks disparate treatment of her and other women as compared to the males who occupied optimal office space for her relocation. I told Rodriguez that I was unable to help her and suggested that she report this information to McCarthy. This was one of many examples I provided Cornell and DHR investigators.

17. On multiple occasions between 2011 and 2016 I openly and directly told Banks I did not agree his unequal decisions, lack of promotion and professional development of me, and on other occasions that I was unhappy with and intolerant of his or Mazza's bullying and degrading treatment of me—stemming from as far back as a 2011 encounter with Mazza. Whenever I communicated my concerns directly I also shared that I had done so with AAD HR staff, including AAD HR Director Joseph D'Abbracci and his direct reports, as a protective measure. All of this was documented and later shared with Cornell's investigator, Laurel Parker (as requested by her—although time barred).

18. Initially after these direct discussions with Banks, he would seem sorry and sometimes verbally apologized to me, and would curb his behavior temporarily. However, after the departure of Senior Associate Vice President Pat Watson (a female) in October 2012 this unequal treatment escalated. Banks had consistently voiced his displeasure with Watson's leadership and constantly attempted to undercut Watson's authority, which I believed was because she was female and promoted above him. Some members of my staff and male colleagues also reporting to Banks were also aware of Banks' displeasure with Watson's promotion and his undercutting of her authority which I was sensitive to and counseled my staff about.

19. Despite her more senior position 2009-2012, Watson was not privy to all salaries, hiring decision, and promotions in the Division. Only the Division's VP, Banks, HR Director D'Abbracci, and I had all of this knowledge.

20. Banks' and Mazza's capitalized on University senior leadership changes as vehicles for their unlawful conduct, both gaining more seniority and authority during major leadership changes (Watson's departure in October 2012, longstanding VP of AAD departed May 2015, and Cornell was going through a presidential transition from 2014-2015)/ During this time, the unequal treatment of me and of other women, continued retaliation for opposing gender based decisions, and gender-based promotion and pay decisions intensified.

21. I voiced my concerns through prescribed channels, which has been extremely stressful amid a demanding career and as the parent of two school-aged children. Whenever, and however I raised these issues through formal processes at Cornell, I experienced both subtle and overt retaliation, characterized by Cornell as "micro-aggressions," for opposing gender discrimination and other unequal treatment of women. The

3

discrimination had adverse impacts on the people who worked with and for me, which was reported and documented to Cornell and DHR investigators.

22. Witnessing and experiencing how compensation and promotional decisions were made based on gender impacted the way I approached and performed my job as Senior Director of Administration under the direct supervision of Banks for 11 years.

23. Experiencing the retaliation and "micro-aggressions" whenever I questioned his decisions negatively also impacted the way I approached and performed my job, my ability to do my job, and potential for grow and success in my career. Because of the constant fear of retaliation, I was often forced to adjust my approach or remain silent for fear of being worked around and left out of meetings that were an integral part of my responsibilities, my professional development and my career trajectory—namely as Banks' successor— which even he had indicated I was being groomed for up until I opposed gender discrimination.

24. As part of Cornell's investigation into my complaint in 2015, Cornell's investigator Parker requested I provide a complete historical chronology of all of my documented experiences including what I witnessed, analyzed, and experienced first-hand, even though most of the incidents are were time barred under Cornell policy 6.4. Parker referred this request as a "confidential annotated chronology" that she would then use to map her investigation into these matters, and which would serve to establish a pattern of behavior. Consequently, I provided a lengthy history of examples, and specific individual comparisons of women to men to illustrate pay and promotion inequity. This confidential information demonstrated a longstanding pattern of discrimination, hostile work environment, harassment and retaliation over many years which was then used by Cornell as an instrument of retaliation against me for opposing discrimination, and subsequently as a tool for Cornell to back-correct these pay and promotion inequities.

25. During the course of the investigation, all of the gender-based compensation inequities I raised as examples in the confidential annotated chronology, except for my own, were rectified by Cornell which supports the lack of confidentiality surrounding my complaint to Cornell's WPLR.

26. I often complained to AAD's HR director D'Abbracci, who also had a reporting line to Banks and whose work was also directed by Banks and other AVPs in the Division, including Mazza. I noted that subsequent to my complaints to D'Abbracci, the retaliation became more worsened and the hostile environment became more stressful. During at least one conversation in 2014, D'Abbracci negated my suggestion that I was experiencing sexism, gave me a book to read called "The Bully in The Ivory Tower." When I asked him where I could share my concerns, he suggested that I share them with the Ombudsman's office and never once referred me to the Office of Workforce Policy and Labor Relations. I was also told by D'Abbracci that I

4

was on the succession plan submitted to central HR as Banks' replacement and that pursuing my complaints would not benefit me.

27. After receiving a complaint from a staff member about Banks in 2013, I sought advice from the University Ombudsman which resulted in a series of 9 separate and lengthy meetings over a year to determine the proper course of actions necessary to address the wide scope of issues that had surfaced, including gender discrimination, conflict of interest, abuse of power, hostile work environment, unequal pay, and retaliation for opposing all of these.

28. After the fourth visit with the Ombudsman's office it was recommended that I share my concerns directly with then-University President, Dr. David Skorton, which I did in a 30-minute pre-arranged meeting organized by the Ombudsman in his office on January 21, 2015. Some of the information I shared to support my concerns was information limited to a small circle of knowers (including me), which left me exposed once the issues began being addressed and after then-VP of AAD and President Skorton departed from Cornell in May and June of 2015.

29. In April 2015, a male manager reporting to me wrote an email to the VP of AAD, HR, and Banks, copying me. The email was about senior management decisions, climate, employee performance, and gender based decision-making in pay, performance, and promotion. As a result of this email, Banks and D'Abbracci were very upset and directed me to discipline and demote this employee, which I openly refused to do, sharing my concerns with Julie Addy from central HR. I was retaliated against for NOT retaliating against this employee.

30. In May 2015, the Ombudsman asked to meet with me to follow up on the results of my discussion with the President in January 2015. The Ombudsman shared that he had a conversation with the President and among other things, that the President committed to making sure that the Vice President of Human Resources would address the issues I had surfaced around gender discrimination, unequal pay of women, and hostile work environment for women at AAD. I confirmed my understanding of this planned intervention when I met with the Ombudsman once again on the continuation of these discriminatory practices in October 2015.

31. During the May 2015 meeting with the Ombudsman, I also shared my concerns about Banks and D'Abbracci's reaction to the email sent by my employee in April. The Ombudsman recommended that I have the staff member send his concerns in an email directly to the President, which would be kept confidential and would further document the issues already shared with the President. I conveyed this recommendation to the employee who in turn sent the President an email which included his concerns about Mazza and Banks sexist decisions. Almost immediately after the President's departure from Cornell

in July 2015, this employees confidentiality was breached when this information made its way back to me through HR channels, by D'Abbracci and AAD interim VP McCarthy. There was no action taken by Cornell HR to support the employee who complained and instead he was targeted by D'Abbracci and Banks. This information was provided to Cornell investigators and DHR/EEOC.

32. In July 2015 Cornell commissioned a post-campaign study of Alumni Affairs & Development. Part of this study included a survey of AAD with questions specific to climate and opportunities to provide open-ended feedback for improving the organization. I am personally aware of at least seven (7) women, including myself, who provided anonymous feedback specific to gender inequity and gender discrimination in response to this commissioned survey. In addition, nearly 100 AAD staff were interviewed in person by commissioned consultants and asked questions about supervisor relationship.

33. The consultant interviewing me shared that he had a friendship and golfing relationship with Banks, and asked me specifically about my professional relationship with Banks.  I later learned that the interviewer asked my staff and at least one Program Director peer about my suitability as a leader in the organization. Upon information and belief, this was not consistent with how other interviews were conducted during this review. When I asked Banks why the consultant was asking other staff about my leadership, he said he did not know.

34. Banks was and continues to be a paid consultant for the same company commissioned by AAD for this study.

35. As part of my complaint to Cornell, I asked that this 2015 climate survey and interview data be examined. During an Appeal meeting in June 2016 Vice President of Human Resources Mary Opperman, I was told that the results of the climate report and survey information that Cornell commissioned and paid for were never provided back to Cornell by the consultant, and that another climate survey would be commissioned (which was subsequently performed by Cornell HR in July 2016).

36. When I formally wrote my complaints of discrimination to Cornell and DHR/EEOC, I included an incident of hostile harassment imposed on me by Mazza on or around August 5, 2015. During this incident I was meeting with Mazza and two other individuals when Mazza became noticeably hostile toward me through his comments directed toward me during this conversation and his aggressive tone. He did not allow me to talk during the meeting, made negative remarks about my participation, and praised my male colleague for leading a team that was and had been supervised by me for more than 4 years.

37. This incident was reported to my supervisor, Banks, by the male employee David Pinker as uncomfortable and hostile toward me. I also followed up by voicing my concerns and intolerance for this behavior to Banks, and this was included in my complaint to Cornell and DHR/EEOC.

38. These types of demeaning slights and overt disrespect were common themes in my meetings with Mazza, causing me humiliation and diminishing my credibility as a leader in the view of all who witnessed or heard of this behavior. Mazza and Banks encouraged staff to work around me, leave me out of key meetings that impacted my programs and staff (thereby hindering their upward mobility) on a number of occasions which was crippling to my career and was completely inconsistent with how my male counterparts were managed. What started as sexist unequal treatment, after I began complaining to Banks and Mazza, had evolved to hostile harassment and retaliation directed toward me for opposing unequal treatment by both of them.

39. On October 2, 2015, Mazza was displeased with a hiring decision one of my direct reports made. After he complained to Banks, Banks sent me an email that was hostile and punitive, accusing me of not following protocol for this hire which was actually an entry level position several layers down in the organization. The disrespect and disparate treatment I was subjected to compelled me to reach out for help from the Ombudsman's office to understand hiring policy.

40. On October 6, 2015 I met in person with HR director D'Abbracci in his office and voiced my displeasure with Banks email. I have previously cleared the hired through D'Abbracci's office. I told D'Abbracci I was upset with the continued disparate treatment of me and others by Banks and Mazza. Later that afternoon Banks and D'Abbracci met in D'Abbracci's office, next to my office, for several hours and were overheard by me discussing this matter, with Banks saying I had 'a lack of common sense'. I sent an email letting D'Abbracci and Julie Addy know the discussion was overheard.

41. On October 8, I met with and made a formal report of sexism and disparate treatment by Mazza and Banks to interim VP Jeff McCarthy.

42. I scheduled meeting with the Ombudsman's office for October 15, 2015 to discuss Banks' and Mazza's complaint about my hiring decision and addressing the longstanding and previously reported gender discrimination issues.  Ombudsman Linda Falkson again urged me to take the matter to the office of Workforce Policy and Labor relations as she had urged me a year earlier. I reminded her of my concerns about Banks' longstanding friendship with Mittman and she personally vouched for Mittman's integrity as an attorney and Cornell policy 6.4 expert. Against my better judgment, I scheduled a meeting with Mittman before my discussion with Addy and Banks.

43. I began meeting with WPLR's investigators Parker and Mittman on October 20, 2015 to discuss my options for formally addressing these issues. During this time, I directly shared my concerns with Mittman about my reluctance to file a complaint with his office because his close personal ties to Banks. Mittman allegedly recused himself from the investigation. However, later when the final investigative report was accepted in it's entirety by AAD's newly hired Vice President Frederick Van Sickle (a full seven months after

7

the initial filing of the complaint), Van Sickle's email was sent via email to me, Respondents Mazza and Banks, and also included non-interested parties including Mittman who was not copied on the investigative report nor on the electronic submission I received. Van Sickle's email also copied D'Abbracci, who was not party to this action. I questioned this breach of confidentiality as part of my appeal to VP HR and as part of my DHR/EEOC complaint. This exposure and sharing of confidential information was not appropriate and not consistent with the confidentiality requirements for these matters – neither Mittman nor D'Abbracci should have been included in the complaint process.

44. On October 22, 2015 I met with Banks and Julie Addy from central Cornell Human Resources, regarding the hostile email I received about the hiring decision that had upset Mazza. I stated that I believed that Banks and Mazza questioned my decisions and were hostile towards me because they are sexists and because I am female and because I have opposed their gender discrimination for years. I provided examples during this meeting of other times I have been treated in a hostile and harassing manner and had reported this to Banks.

45. During this meeting and in front of Addy, Banks acknowledged that I raised issues of hostile treatment by Mazza directly to him as my supervisor on four separate occasions over several years. During this meeting, Banks continued to address me in a demeaning and hostile manner in the presence of Addy, and despite his misunderstanding of the hiring policy and Addy's clarification about the policy, Banks continued to make sarcastic remarks to me, including thanking me for telling him how to do his job. This meeting was demeaning, humiliating, and Addy did not seem comfortable intervening, rather she acquiesced to Banks inappropriate and unprofessional attack of me. This evoked so much fear and stress in me that 23 minutes into this meeting I excused myself from what I considered an abusive situation. Addy and I had taken notes in the meeting, Banks did not.

46. The emboldenment of AAD's male senior leaders, Banks and Mazza stems from protection from AADs director of HR (as a report to Banks) as well as relationships with key leaders in the University. This has been the common denominator for others who have ignored and defended these actions.

47. For several years, Banks had repeatedly made me aware of his close personal relationship with Allan Mittman who oversaw the University's Title IX office, Workforce Policy & Labor Relations (WPLR), University Counsel Jim Mingle, and other influential leaders at Cornell. For those reasons and relationships, I was fearful of filing a complaint at any level with Cornell, and particularly with the University's Title IX office.

48. Between October and December 2015, I was one of four senior women who complained to AAD's interim VP McCarthy about Banks' and Mazza's treatment of me and other women, and to express intolerance for the longstanding gender inequity, and to ask for intervention. None of these women were or could have been aware of the compensation inequities that I was aware of by privilege of my position. I explained this to

McCarthy who asked me and others to share our complaints with University's Title IX office, Workforce Policy & Labor Relations (WPLR).

49. On November 2, 2015 Banks, who I had confronted with my claims and who was aware that I was pursuing a complaint, downgraded my previous rating to a 4. I had a long history of superior performance ratings (5), including the two (5)-ratings received from Banks in 2014 and again in April 2015, just 6-months prior to my formal complaint. I received a lower rating on my performance evaluation because I openly opposed discrimination and was pursuing a formal complaint against Banks and Mazza.

50. Prior to this performance conversation and after my meeting with Banks and Addy where I clearly stated I was complaining of sexism, I asked McCarthy and Cornell investigators if I should meet with Banks for the reschedule performance discussion, and was advised to proceed with the meeting. During the conversation with Banks and afterward, I disputed his rating of me and wrote to Banks and investigators that I believed this rating was in retaliation for my complaint and that I would not be signing the performance dialogue without evidence and support for its commentary.

51. No one beyond Banks ever requested or required that I sign the 2015 performance dialogue document, nor has anyone ever discussed its contents with me or questioned my concerns. Moreover, the subsequent mid-year performance dialog was sidestepped with agreement from Banks. The subjective lower rating was used as tool of retaliation for opposing gender discrimination in that it was referenced as a legitimate evaluation in Cornell's investigative report.

52. I never received another performance discussion from anyone during the next year of my employment at Cornell up until I departed in November 2016.

53. Cornell refused to provide objective HR support for me during the course of the complaint process, and the poisoned and unsafe environment I was subject to, including a threatening interaction with the HR Director, D'Abbracci on December 21, 2015 in his office which left me fearful. I discussed this in a meeting with Addy on the morning of December 22, 2105 in her office at East Hill Plaza which resulted in her taking over the handling of my 360 feedback evaluation. During this meeting with Addy I discussed specific issues of integrity and my concerns about collusive efforts between the HR organization and Banks, citing a specific audit financial audit issue Addy, D'Abbracci, and Banks were party to. I expressed to her that I was concerned with HR's credibility and quid pro quo relationship with Banks.

54. In December 2015, Banks refused to put forth my job description for evaluation which is incumbent on supervisors, which required me to use the employee-driven process to request a job evaluation. HR Director D'Abbracci then put the job description before Banks for approval anyway, and it was eventually denied. This process is not consistent with how positions held by others, including Banks himself, were upgraded and

9

promoted. In addition, HR's refusal to provide objective support for its compensation and job banding review decisions, even after my request during the visit with Addy on December 22, 2015, and after my written request amounts to retaliation for opposing discrimination.

55. Banks seemed undeterred by my formal complaint and in January 2016, just 9 weeks after the complaint was filed, Banks encouraged a male leader to overreach me and take management of the Training program (under my responsibility) without any discussion with me. When I asked Banks about this in January 2016, he shrugged and simply said "So?" and completely dismissed me without another word.

56. The ongoing collusion between Cornell WPLR, HR, and AAD leadership, including protection and sympathy toward Banks and Mazza because of personal and professional relationships, made it impossible for a fair and objective investigation these issues, and led to the destruction of my career at Cornell, and significant personal loss to me and my family.

57. On or about January 22, 2016 I was called to a meeting with Banks, D'Abbracci, and another male leader to discuss the transfer of his female staff member into the business intelligence program I managed and supervised, which was encouraged and approved in an email to me by Banks on January 7, 2016. The male leader wanted to discuss the viability of promoting and compensating the woman as part of the transfer to her new role on my team. Banks and D'Abbracci both agreed with the male leader that this could be done as a 'good will gesture' for this employee if I agreed since she would be managed by my program. This conversation occurred during the course of the investigation and confirmed that my compensation review request was handled differently by Banks and that he could have made a similar "good will gesture" given my exemplary performance and track record, but did not. Instead Banks held back my promotion by using Cornell HR as a third-party retaliator. I reported this to Cornell and DHR investigators.

58. Subsequent to this discussion I received an email from Banks suggesting how I should communicate with the male supervisor whose employee was transferring to my team. The email was an instrument of retaliation by Banks and D'Abbracci who colluded to manufacture a scenario where I was required to verbally communicate with the male manager. Banks' and D'Abbracci's expectation around this communication and the management of me in this regard, and the subsequent reporting of this by D'Abbracci to Cornell investigators (by email, which he inadvertently sent to me instead of Julie Addy) was retaliatory, was not consistent with expectations of male leaders, and demonstrated D'Abbracci's role as a third-party retaliator. I immediately discussed this matter with Addy, WPLR, and included this in my DHR/EEOC compliant. I was not made aware of any action taken.

59. In February 2016, another male leader who reported to Mazza directly approached a member of my team and asked her to apply for a position in his program area. There was no discussion with me in advance, or after, or

with the staff member's direct supervisor who is also a woman. This was precisely the action I was admonished for by Banks and Mazza on October 2, 2015 which lead to my formal complaint process.

60. These examples of disparate treatment, overreaching, hostility, and interference in the decision making that women, including me, were subjected to by Banks and Mazza were frequent, and were not consistent with how Banks and Mazza managed and led male colleagues. In fact, quite the opposite when compared to these are examples of male staff not following the very protocol Banks and Mazza accused me of not following.

61. Up to my departure from Cornell in November 2016 I witnessed male staff members being held to different standards than me and other women were. This was substantiated over and over again, for example, when several of my team members were asked by male leadership to participate on committees without clearance or a courtesy contact to me, the Senior Director and supervisor. In addition, I was not informed when male leaders asked a staff member to put aside important work on a key strategic technology initiative in July and August 2016 to sew costumes for Banks' retirement party. Men were not held to the same clearance standard for hiring staff and are not treated in the same manner when, and if, their decisions were questioned. I believe I was subjected to such disparate treatment because I am female and because I formally and informally opposed gender discrimination directed toward me and others by Banks and Mazza.

62. Between November 14, 2015 and May 1, 2016 when I finally received Cornell's investigative report, my internal complaint failed to be investigated in accordance with Respondent's rules and investigators did not keep me apprised of the 6.4 investigation process. The process was biased, unprofessional, had no prescribed methodology, and the investigator was unprepared, casual, and at times, dishonest. When I questioned her about this, she became confrontational. Her line of questioning and inconsistency was shocking and I was both regretful and fearful that I had filed the formal complaint with Cornell's WPLR.

63. During the investigation from November 2015 – May 1, 2016, Cornell's investigator Parker used much of the information I provided in the 'confidential annotated chronology' she requested to discredit me, particularly during interviews of AAD staff who were told directly that I had filed a complaint against Banks and Mazza and who received direct quotes about my experiences from the 'confidential annotated chronology' that was promised to be kept confidential.

64. Parker went so far as telling interviewees to 'distance themselves' from me, and that I suffer from 'psychological issues', and that there was 'no evidence to support the claim', that Mazza is 'married to a feminist' and thereby cannot be a sexist, and that I filed the claim because I 'wanted Banks' job'. The confidentiality breaches poisoned the work environment following WPLR investigators interviews with uninterested and hostile witnesses. These interviews had no direct connections to the pertinent (non-time barred) complaints that should have been directly investigated by WPLR.

11

65. The rumors unleashed through investigator Parker's inappropriate questioning between January and March 2016 damaged my professional reputation, left my staff and colleagues feeling targeted, and stymied my ability to have an objective review of my complaint.

66. The investigation far exceeded the 60-day timeframe with no communication to me and the details of my complaint were not kept confidential and were instead disseminated to non-interested parties throughout the investigation.

67. Cornell's investigative report contradicts itself in that it recommends dismissing my complaint and further recommends "... steps be taken, including a climate assessment in support of future organizational changes, to address the issues of communication, trust, perception of lack of promotional opportunities, and transparency in decisions such as office moves, training, interim assignments, and advancement."

68. Cornell's response to my complaint is a tool of retaliation on its own, and is intended to create a vision of a problem employee rather than an employee in good standing who has a proven track record of stewarding university resources – both people and tools – and who has a demonstrable history of partnering with other operations leaders within the university to foster administrative streamlining and realize efficiency savings for the University.

69. On January 22, 2015 investigators questioned me about having a sexual relationship with Banks and Mazza which devastated me, caused me extreme stress, and left me in tears. I was told by Cornell's investigator Parker (in the presence of her co-investigator Richard Kuhar) that my complaint "reeks of a personal vendetta" and that her experience suggested there was more to the story than I was providing. I was also asked specifically "what happened a year ago" as if something specific had occurred to trigger my complaint. This line of questioning was alarming, stressful, and was not based in any facts that were expressed to me. My complaint was not handled appropriately by Cornell and the investigation and report were used as instruments of retaliation because I exposed Cornell's executive leadership by formally opposing discrimination, including Cornell's human resources, under which WPLR reports.

70. Cornell's investigator Parker's posture was hostile and intimidating without regard for confidentiality. As a result another female employee who had complained of discrimination to McCarthy in October 2015 and who was considering pursuing her own complaint was fearful based on her own experiences with WPLR and the investigation of my claims, opted to bypass Cornell's and file a complaint against Banks, D'Abbracci, and Parker through the DHR/EEOC process.

71. Because Cornell's investigator Parker's posture was hostile and intimidating and without regard for honesty, integrity, and confidentiality, another female employee (different than above) requested that her entire testimony be redacted and not included in this case. This witnesses was fearful of retaliation

because investigator Parker was not objective, was dishonest, and repeatedly attempted to shepherd witness questions and answers toward her intended and repeatedly stated 'no finding' outcome.

72. The report issued by Cornell investigators in response to my complaint recommended that AAD conduct another climate survey, which was done in July 2016. The survey results provide wide acknowledgement that there was inequity and gender bias at AAD at that time. The climate study results supported my claim and called for an immediate change to AAD's culture.

73. In addition to the comprehensive climate study overview, results were provided for each AVP area, including Banks. Banks' results reflect lower than average scores in areas relating to employee satisfaction, respect, inclusiveness, ability to speak up when others are excluded or treated inappropriately.  The numerical data alone supports my claim of gender discrimination, fear, and retaliation.

74. The collusive relationship between Parker, Addy, D'Abbracci, Banks, AAD leadership was obvious during DHR's investigative conference in December 2016. During this meeting Banks and Parker sat together, whispered to one another, and I learned that Cornell investigators had provided the final investigative report to VP Van Sickle in March 2016, approximately 7 weeks before I (the complainant) received any indication that the investigation had been completed and a report had been written.

75. This new information contextualized the changes in my job responsibility and treatment of me by Cornell leadership between March and May 2016. The AVP Operations position, which Banks was retiring from, was announced and posted on April 22, 2016 (opened until May 22, 2016) after Van Sickle received the Cornell's investigative report in March and before I received it on May 1, 2016.

76. The job description as posted contained language directly from the WPLR investigative report, specifically 'collegiality and civility' which cannot been found in any other previous position description. Cornell's investigative report accused me of having a lack of 'collegiality and civility,' and was accepted without my rebuttal by VP Van Sickle on May 16, 2016.

77. The AVP position description was written by Banks and D'Abbracci and both were extensively involved in the hiring process including interviewing candidates. This was an act of retaliation against me for opposing gender discrimination. In addition, while male peers and colleagues were waived into promotions in April 2016, I was not similarly waived into the promotion to Banks AVP role, nor was I asked to apply by Banks, D'Abbracci, or anyone on the leadership team who were responsible for developing and promoting talent in the organization.

78. D'Abbracci and Banks began searching for Banks successor in December 2015 once my claim was filed and before VP Van Sickle started in his role January 2016, by "confidentially" approaching several female colleagues in the financial community about their interest in Banks position. No one from AAD leadership or

HR ever encouraged me to apply for the job, nor was I promoted into the role like male counterparts were waived into promotions. Conversely, I was discouraged from applying for this role by the way the job description was written and correlating language in the investigative report. I raised this concern in both my rebuttal to Van Sickle and in my appeal to VPHR Opperman on May 17, 2016 and June 6, 2016.

79. In March 2016 (after secretly receiving Cornell's investigative report without my knowledge) VP Van Sickle decreased my job responsibilities by prohibiting me from participating in the annual budget process in March 2016, a role I had served for 10 previous years, with no explanation or discussion whatsoever. This decision was communicated to me by my supervisor Banks with no explanation. This was a materially adverse action under the law and this and other actions taken against me by Cornell would deter a reasonable employee from complaining about discrimination.

80. After receiving Cornell's final investigative report on May 1, 2016, I followed policy 6.4 and contacted VP Van Sickle to request an extension to reply to the 93-page report that was rife with inaccuracies and required thorough review. It was not possible for me to thoroughly read, review, and respond to this report that had taken nearly 6-months to complete within the 10 days I was allowed to respond under Cornell policy while working full time and caring for my young family. I requested an extension to June 1, 2016 which Van Sickle declined. Instead he allowed me 3 additional days, which included Mother's Day weekend and one business day to complete my rebuttal. The rebuttal was hand delivered to Van Sickle on the morning of May 17, 2016 and was then denied by Van Sickle for being untimely just hours later with an email acceptance of the final investigative report, as written by Cornell investigators. The lack of collegiality and civility from Van Sickle and his failure to afford me the same flexibly and courtesy that had been extended to Cornell's investigators, when compared to what was written about me in Cornell's investigative report, demonstrates unequal standards of civility and collegiality for males and females. In addition, Van Sickle's approach was careless and lacked objectivity, a common theme during my formal complaint process.

81. During the final step of the internal Cornell process in June 2016, I appealed the finding to VPHR Opperman, the final reviewer. Opperman also oversees the work of the WPLR office. During her review, Opperman spoke directly with at least three witnesses to these claims: David Pinker, Senior Director of Advancement Services; Kristen Ford, Assistant Vice President; and Brenda Rodriguez, Director of Events Management as witnesses to these happenings. All of these individuals confirmed to Opperman that the hostile work environment, unequal treatment and compensation of women, and retaliation had occurred.

82. Pinker attended a meeting arranged by VPHR Opperman on June 6, 2016 as a witness. He openly shared with VPHR his first-hand experiences witnessing unequal and hostile treatment and harassment of women and

14

retaliation toward me during this meeting, and specifically confirmed the cited examples of unequal treatment and hostile gender harassment by Banks and Mazza that were investigable per Cornell policy and clearly outlined in my appeal request.

83. Pinker told VPHR that the behaviors and treatment by Banks and Mazza toward me and other women during these occurrences were not consistent with how he and other male senior directors were treated by Banks and Mazza, ever, and were uncomfortable for him as a male to be subjected to.

84. During this meeting, Pinker told VPHR Opperman that his experience with Cornell's investigators was troubling, subjective, leading and that investigators read to him directly from my confidential annotated chronology statements, openly stating that ' Featherstone said…" and referenced comments intended to antagonize him and provoke defensive testimony unfavorable to my claim. Pinker had received written documentation of quotes directly from my confidential chronology that was emailed to him by Cornell investigators. Pinker told VPHR Opperman that he would provide supporting testimony to NYS Division of Human Rights/EEOC if these matters moved outside Cornell.

85. Upon information and belief, Ford and Rodriguez, also subjected to the inequitable treatment by Banks and Mazza and who also reported this treatment to interim VP McCarthy and WPLR investigators, provided similar supporting testimony as part of the appeal process.

86. During my meeting with Opperman on June 6, 2016 and in the presence of a witness, I was not only discouraged from applying for Banks' role, but I was asked to consider other options and provide "5 things" as conciliatory remedies.  Opperman suggested this could include other leadership positions in the University and continued professional development. She recommended that I looking into pursuing a doctoral program through the University of Pennsylvania and that Cornell would pay for this as part of a conciliation process. I asked for revisions to the WPLR investigative report and VPHR Opperman suggested that I consider asking that the investigative report be expunged in its entirety. These suggestions and recommendations were made to me on June 6, 2016 in the presence of employee witness Pinker.

87. On June 13, 2016 I advised VPHR Opperman that I was not interested in another job at Cornell and that I wanted to be fairly considered for the position I had prepared for my entire career at Cornell for, which was Banks AVP role.  I asked VPHR Opperman to delay the interview process for Banks replacement until the appeal process was settled. There was no urgency to fill this position as Banks was and is still employed by Cornell AAD (through June 2017) and continues to report directly to Van Sickle. VPHR Opperman said it was not within the scope of her authority to delay the hiring of the AVP position pending the outcome of the appeal. Since the posting was scheduled to close on May 22, 2016, and since VPHR Opperman was not going

to complete her appeal before the position closed, I applied for the job and was interviewed for the position within days.

88. Cornell AAD employs approximately 350 staff across a university of 10,000 employees. Seven (7) of the eight (8) interviewers on the committee (which did not include Banks, who was recused from my interview process) were witnesses interviewed by Cornell investigators and were privy to the details of my complaint against Banks and Mazza, the ensuing investigation, and Cornell's 'No Finding' report. Interviewers included Addy, D'Abbracci, McCarthy and Van Sickle. One of the interviewers reported to me after the selection process that she was troubled by the different approach to me and and questions asked in my interview as compared to questions posed to the other candidates. Two interviewers shared with me that their feedback was not solicited and they were not kept informed of candidate selection process.

89. The fact that the questions and tone of my interview were noticeably different than the other candidate interviews, and the many departures from standard recruiting and hiring process/practice at Cornell AAD amount to retaliation for opposing discrimination. The hiring process for this position was largely influenced by D'Abbracci and because of that, it is obvious that I was never considered for this role.

90. On July 18, 2016 a less experienced candidate was selected to replace Banks in the role of AVP. VP Van Sickle contacted me via phone to tell me that he felt like the selected candidate was a better fit and he liked her 'calm demeanor' to which I did not reply. The individual hired for the role was not the most qualified candidate, and in fact documentation from interviewers suggests otherwise. In addition, D'Abbracci outright refused the standard practice of objective measured feedback by interviewers about job candidates, which is in direct conflict with AAD's normal hiring practice at AAD and amounts to retaliation for opposing gender discrimination.

91. On July 27, 2016 VPHR Opperman issued her decision on my appeal request which upheld WPLR's finding and also acknowledged my complaints and offered to pay for a professional career coach.

92. Between November 2015 and until Banks replacement was hired in August 2016, I continued to report to Banks who refused to interact with me and who made derogatory statements about me to and around my staff, undermining my credibility as a leader and my future at Cornell. I was ignored, worked around, reached over by Banks, not included in meetings, my job was compressed and responsibilities stripped, and I was passed over for a promotion while male counterparts with less exemplary track records were at the same time waived into promotions. All of this retaliation for opposing gender discrimination amounted to the loss of my career potential and retirement plans at Cornell University.

93. Because I opposed discrimination, I was undercut, excluded, and frankly ostracized and my career was destroyed. In order for me to rightly grow in my chosen profession, fundraising operations, I was required to

give up career and retirement plans at Cornell, tuition benefits for my college student, retirement contribution, and fracture my family structure because I opposed gender discrimination.

94. In October 2016 I was offered and accepted an AVP of Advancement Operations role at a top-ranked higher education institution of comparable size and structure as Cornell and with a larger endowment. As a result I have had to leave my home, immediate family, my domestic partner, friends, and give away my pets. My children are living in separate states and I am paying for two residences so my daughter can continue her educational plans. The damages I experienced for opposing gender discrimination are immeasurable and profoundly devastating.

95. During the course of DHR's investigation in January 2017 Cornell continued to influence the investigative process by intervening in witness testimony. Cornell's attorney's interfered with employee witness testimony by requiring legal presence in employee witness interviews with DHR investigator, and by requiring employee witnesses who had already spoken to the DHR investigator to debrief with Cornell's attorney. Some Cornell employee witnesses reported in sworn affidavits both fear and discomfort for participating in this process.

96. In April 2017 I filed a petition in NYS Supreme Court asking that DHR's No Probable Cause Finding be reversed because it is arbitrary and capricious and not based on the available evidence. As part of DHR's response to my filing, I received DHR's investigative report in support of their finding which I had not seen before, and which provides additional information previously unknown to me about about the investigation of my complaint. These documents, along with other evidence provided by Cornell in response to my Petition, further confirm that I have been retaliated against for opposing gender discrimination.

97. As part of its response to my NYS Supreme Court Petition, Cornell, for a second time, called each employee witness who provided testimony to DHR to Cornell's Office of Legal Counsel and asked those employee witnesses to sign affidavits before a notary public stating that they were not intimidated by Cornell. The mere act of requesting employee witness presence at University Counsel's office to sign affidavits is intimidation by any common standard.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: Gender Discrimination and Hostile Environment Harassment
### (as a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq.)

Paragraphs one through 97 are incorporated by reference as if stated in full herein.

98. Defendant Cornell created a hostile work environment for women, including me, by allowing unwelcome, severe, and pervasive abusive treatment of women by senior male employees. This behavior was so severe

17

and pervasive toward me that it suffered anxiety each time I had to meet with Banks and Mazza. Not only was I frequently demeaned, ignored, humiliated, and attacked, this behavior was done so openly and in the presence of others which was reported to Cornell and DHR/EEOC investigators by those witnesses. I witnessed other women being disrespected by Banks and Mazza, including in the presence of other male employees. These longstanding, emboldened behaviors show that the defendants see themselves as 'above the law' as they fearless exhibited malicious and reckless disregard of my federal rights, even after a formal complaint was filed.

99. Defendants made derogatory remarks about me to my staff and others, in person and in writing, prior to and during the course of the investigation. When I complained of this to Cornell's WPLR investigators and human resources staff, no action was taken and the hostile work environment continued. The hostile environment harassment was so pervasive that it was apparent to staff who were often put in compromising positions by Defendants.

100.    I complained of gender discrimination and hostile environment harassment because it was wrong, it was negatively impacting me and other women who complained to me, and because I was the only female knower of key compensation information. The continuation of these unlawful acts affected my health and wellbeing, my professional growth and that of other women, my ability to manage my staff and be viewed as a credible partner by others in the organization, and it stymied my professional goals by capping my ability to grow and develop as a leader. This gender discrimination affected my ability to do my best work, created discomfort with my staff and colleagues who felt targeted in this environment, crippled my ability to be successful at AAD, and showed malicious and reckless disregard of my federal rights, even after a formal complaint was filed about all of these claims.

101.    Defendants, including top leadership and my supervisor, continued the hostile environment harassment even after I filed a complaint by changing my job, undermining and stripping my authority, and limiting my ability to direct my staff. Expectations of me in these regards was not the same as expectations of my male counterparts. I reported this to Cornell investigators who failed to take prompt and remedial action and left me exposed. For months and during the investigation, the HR director D'Abbracci, Banks, Van Sickle, McCarthy, and others did not speak to or acknowledge me. This hostile environment harassment adversely impacted my psyche, my reputation, other's perceptions of and comfort working with me, and consequently my ability to be successful in my job. This eventually became intolerable and led to my departure from Cornell and negatively impacted my income, retirement plans, personal life, and my family structure.

**SECOND CAUSE OF ACTION: Unequal Pay of Women**

**(as a violation of the Equal Pay Act of 1963, 29 U.S.C. sec. 206(d))**

Paragraphs one through 101 are incorporated by reference as if stated in full herein.

102. Title VII and the Federal Equal Pay Act (FEPA) prohibit wage discrimination between employees on the basis of gender for equal work. I performed work at Cornell requiring equal skill, effort, and responsibility under similar working conditions as my male 'Senior Director' and 'Program Director' counterparts at Cornell AAD, and was under-compensated, under-promoted, and under-developed for many years. This professional neglect showed malicious and reckless disregard of my federal rights, even after I raised these issues informally and directly with Banks and others, and after a formal complaint was filed.

103. My supervisor Banks, in his capacity as AVP of Administration, was the senior financial officer for Cornell AAD and had delegated authority for financial decisions and division wide HR oversight. In my role as Senior Director of Administration, I observed the manner by which Banks authorized compensation changes and promotions for male and female employees which included salary and promotion compression for women and salary and promotion escalation for a selected group of male leaders who were favored by Banks and Mazza. This trend continued over my entire career at Cornell. Senior women were paid less, promoted less, and invested in less than male employees who performed substantially equal work requiring similar skills, effort and responsibility, and under similar conditions, which demonstrates Defendant's malicious and reckless disregard of my federal rights and the equal compensation rights of other women, even after a formal complaint was filed.

104. Defendants showed malicious and willful disregard for my federal rights by compressing my salary in my role while male employees in similar jobs with lesser responsibility were paid a higher salary. These decisions were largely approved by Banks who had broad, unchecked authority over the staffing and budget changes. Defendant's decision showed malice and reckless disregard of my federal rights, even after a formal complaint was filed.

105. The Unequal pay of women at Cornell AAD articulated in this complaint was so severe and pervasive that being the only female knower of this compensation and promotion inequity caused emotional distress and anxiety over many years, deprived me of compensation, career growth, retirement contributions and investment portfolio growth, my child's educational benefits, and resulted in loss of my good standing at Cornell, damage to my relationships and my professional reputation.

**THIRD CAUSE OF ACTION: Retaliation for Opposing Gender Discrimination**
**(as a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., and**
**the Equal Pay Act of 1963, 29 U.S.C. sec. 206(d))**

19

Paragraphs one through 105 are incorporated by reference as if stated in full herein.

106.    Defendant Cornell retaliated against me for opposing gender discrimination with malice and reckless indifference for my federally protected rights, causing me intense anxiety and stress over a prolonged period of time and which has affected my income, professional development, health, family, relationships, community standing, professional reputation, and retirement plans, my financial wellness and my college student daughter's educational plans. As a further consequence, I have suffered a general overall loss of enjoyment of life.

107.    Defendant Cornell undermined my management and supervisory authority and I suffered job compression, unfair treatment, demotion and loss of promotion in July 2016.

108.    Collusive efforts of key influencers in this complaint process made it impossible to have a fair and objective review of my complaints and snuffed my ability to succeed at Cornell AAD, which resulted in my eventual departure from Cornell in December 2016. Cornell AAD managed me out of the organization by 'freezing' me from strategic meetings, undermining my authority, and making other efforts to inhibit my successful functioning, such as:

    a.  Ongoing, systematic bullying by Banks and HR Director D'Abbracci who has repeatedly failed to ensure Title VII compliance in hiring, promotions, salary decisions, treatment and protection—an integral part of an HR director's job responsibilities.

    b.  My 2015 performance dialog was rescheduled by HR in concert with my formal complaint, and delivered after I formally voiced my issues with AAD leadership and HR and was riddled with untrue and unsupported subjective opinion.

    c.  Cornell's WPLR process and the investigators of my internal complaint were hostile, punitive, and breached my confidentiality. The types of questioning of me and other witnesses, the chaos and lack of investigative methodology, the secretive release of the report and the close alliance between respondents Banks and Mazza and the slanted and inappropriate approach to this investigation left me at a disadvantage and exposed me to further harassment and retaliation. Defendant Cornell's WPLR's investigator Parker exhibited a significant lack of integrity and honesty and willfully failed to conduct an objective examination of the issues raised in a timely manner. This caused me significant stress and anxiety, so much so that this impacted my personal and professional life and relationships, health and wellbeing.

    d.  Cornell's refusal to provide objective HR support during the course of the complaint process, and the collusive and unsafe environment I was subjected to, including a threatening interaction with the HR

Director D'Abbracci on December 21, 2015 in his office, left me fearful and concerned. I discussed this in a meeting with Addy on the morning of December 22, 2105 in her office at East Hill Plaza which resulted in her taking over my 360 feedback process.

e. Banks refusal to put forth my job description as my supervisor, requiring me to use the employee-driven process. HR Director D'Abbracci then put the job description before Banks for approval anyway.

f. HR's refusal to provide objective support for its compensation and job banding review decisions, even after my request during the visit with Addy on December 22, 2015, and after my written request.

g. Investigator's lack of impartiality and preconception of the outcome of the investigation.

h. Investigator's discounting of my perspective and relying on irrelevant factors to undermine my credibility.

i. Investigator's breach of my confidentiality and the confidentiality of the contents of my claim.

j. Investigator's noted sympathy toward the reputation of Banks and Mazza during the course of the investigation and the outright accusation that "something more" was driving my complaint, including the suggestion that I was having a sexual relationship with one or both of the respondents.

k. Investigators refusal to keep me apprised of the investigation, and the refusal to communicate with me at all for more than 90 days past the investigation period.

l. The secret release of the final investigative report by Cornell investigators to VP Van Sickle nearly seven (7) weeks prior to my knowledge that the investigation had been completed and the report written.

m. Banks and others excluded me from meetings, conversations and communications as a result of my complaint, meetings that were directly related to my role and responsibilities. Excluding me made it difficult, if not impossible, to perform my job.

n. VP Van Sickle's complete discounting of me as an employee and human being, refusal to reasonably extend my opportunity to refute the contents of the 93 page investigative report, and disinterest in discussing any relevant matters with me at any time before or after the release of the report.

o. Banks and Mazza disparaging me to my colleagues and others during the course of the investigation and beyond, verbally and in writing.

p. The director of Human Resources, D'Abbracci manufacturing an issue with a hiring decision to support respondent's claims.

q. I was required to interview for a position I had been hired and groomed for, and that I had largely performed for a number of years.

r. All processes related to the hiring of the AAD AVP operations position including the advertisement, interview team, interview measurements, and selection process.

109. Defendant Cornell's failure to promote me was retaliatory. Following the release of Cornell's internal investigative report, I was not selected for a job I was completely qualified and prepared for:

   a. I had significantly more experience for the job than the selectee, and it is Cornell's practice that 'experience' is a key criterion for job selection.

   b. The selectee had no experience with HR, Business Intelligence, or Technology Support—all requirements outlined in the job description

   c. I had received the highest rating available (5) on performance appraisal during my tenure at Cornell up to the point that I filed my complaint and have been rated in the top 5% of the organization. Comments by Defendant outlined in the response to my complaint and in the DHR finding are not consistent with Cornell's rating. This is indisputable.

   d. There is sufficient evidence over many years of male employees being promoted without having to apply for those promotions, including Banks and Mazza.

   e. Cornell regularly 'waives' incumbents into promotions (without an application process). I was not afforded this same benefit and practice, and this stonewalling of my career was directly related to the gender discrimination complaint I filed in the months prior to the promotional opportunity.

110. Defendant Cornell subjected me to retaliation by requiring me to interview for the AVP position with seven (7) interviewers who had first-hand knowledge of my gender discrimination complaint against Banks and Mazza, and its outcome, which reflects Cornell's reckless indifference for my federal rights.

111. Defendant Cornell confirmed that my gender discrimination complaint impacted my ability to be promoted at AAD, and VPHR instead offered me other opportunities to continue my employment at Cornell. This discussion and these offerings were made in the presence of a witness.

112. My retaliation claim is met on all criteria: Protected Activity; Adverse Action; Causal Connection. There is overwhelming evidence of causation and that Cornell's explanation for not hiring me was pre textual, including:

   a. Suspicious Timing: Banks retirement and the AVP promotional opportunity were announced in concert with the secret release of the 'no finding' internal investigation to the VP of AAD, and prior to the release of the report to me.

   b. AAD HR director D'Abbracci who reported to Banks, and who was party to the complaint, began secretly recruiting for the AVP position in December 2015.

22

    c.  There is comparative evidence that other employees (males who did not engage in protected activity) were treated more favorably in terms of promotions and were waived into their promotions in April, 2016. This is a longstanding practice; Banks and Mazza were both waived into their AVP promotions with no interview process.

    d.  Cornell leadership has offered inconsistent and shifting explanations as to why I was not selected for the position or waived into the position based on my years of experience and high(est) performance ratings.

113.   Defendant Cornell failed to take steps to protect me from retaliation, prevent its recurrence, and address it as the issues were raised during Cornell's investigative process. This caused me significant stress and anxiety, so much so that this impacted my personal and professional life and relationships, health and wellbeing.

114.   Defendant Cornell failed to protect me from retaliation by taking interim steps prior the final outcome of the investigation. Instead, WPLR investigators completely ignored me and refused to respond to my requests for information between January 22 and May 1, 2016 when I received the final investigative report via email. This left me exposed to continuing hostile harassment and caused me significant stress and anxiety, so much so that this impacted my personal and professional life and relationships, health and wellbeing.

115.   Defendant Cornell failed to use the preponderance of evidence threshold standard to resolve my complaints and failed to notify me of the outcome of the investigation in a timely manner. Cornell recklessly retaliated by providing the investigative report to VP Van Sickle seven (7) weeks prior to informing me that the investigation had been completed.

116.   Defendant Cornell failed to take steps to protect my confidentiality during the investigation process and instead maliciously and recklessly provided confidential information to uninterested parties during the investigation, causing me extreme emotional duress and anxiety and impacting my ability to successfully do my job.

117.   As a result of years of repeated and non-stop retaliation for opposing gender discrimination, I have suffered emotional distress, my character has been impugned, and every area of my life and being has been impacted due to Cornell's malicious and reckless indifference for my rights under Title VII and the Equal Pay Act of 1964.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests judgment in her favor and against Defendant Cornell as follows:

a) Compensatory damages as allowed by law for psychological and emotional distress and damages, loss of standing in the community, damage to my professional reputation, and significant stress and impact on my family, personal life, health and wellbeing; loss of income and investment; and loss of life long educational and retirement benefits at Cornell; and a general overall loss of enjoyment of life.

b) Punitive Damages in the amount of $4,000,000 based Defendant's malicious and reckless indifference for my federal rights as follows:

    a. FIRST CAUSE OF ACTION: Gender Discrimination and Hostile Environment Harassment $1,000,000

    b. SECOND CAUSE OF ACTION: Unequal Pay of Women $1,000,000

    c. THIRD CAUSE OF ACTION: Retaliation for Opposing Gender Discrimination $2,000,000

c) Injunctive relief requiring Defendant Cornell to take effective steps to prevent gender based discrimination and harassment by making it part of the annual performance evaluation process; a performance audit of the WPLR investigators and process; mandatory sensitivity training for Cornell's WPLR investigators and a feedback loop for those who initiate WPLR intervention; define a clear process for responding to conduct that may constitute gender based harassment; mitigate the effects of harassment by eliminating any hostile environment that may arise from or contribute to it; rectify pay disparities between men and women in similar positions. These corrections should be made consistent with the advantages enjoyed by men with similar skills, responsibilities.

d) Costs; and

e) Reasonable attorney's fees.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5.21.17

_____

Signature of Plaintiff

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

<table>
<tr><td>

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

JULIE FEATHERSTONE,

Complainant,

v.

CORNELL UNIVERSITY,

Respondent.

</td><td>

**VERIFIED COMPLAINT**
Pursuant to Executive Law,
Article 15

Case No.
10181821

</td></tr>
</table>

Federal Charge No. 16GB602909

I, Julie Featherstone, residing at 40 Spring Run Rd, Freeville, NY, 13068, charge the above named respondent, whose address is Office of University Counsel 300 CCC Building, Garden Avenue, Ithaca, NY, 14853 with an unlawful discriminatory practice relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of sex, opposed discrimination/retaliation.

Date most recent or continuing discrimination took place is 7/18/2016.

The allegations are:

1.     I am a female and opposed discrimination.  Because of this, I have been subject to unlawful discriminatory actions.

2.     I work for Cornell as a Senior Director in Alumni Affairs and Development. On or around August 5, 2015 I was in a meeting with Associate Vice President James Mazza and two other individuals. During that meeting Mr. Mazza was noticeably hostile with me through his choice of words and his aggressive tone. He did not allow me to talk during the meeting, made negative remarks toward me, and praised another man for leading a team I had led for 4 years. These types of comments and actions have been taking place continuously since 2005. I believe I am subjected to such disparate treatment because I am female.

3.     On or around October of 2015, one of my subordinates made a hire that my supervisor, Associate Vice President Richard Banks and Mr. Mazza did not agree with. I was sent an email that was blatantly hostile and inappropriate for a professional environment. To my knowledge, men are not treated in the same manner when, and if, their decisions are questioned. I believe I am subjected to such disparate treatment because I am female and because I formally and informally opposed discrimination.

4.     On or around October 22, 2015 I met with Mr. Banks and Julie Addy, Administrative Human Resources, regarding Mr. Banks' treatment of me. I stated that I believed that Mr. Banks and Mr. Mazza questioned my decision and were hostile towards me because I am female and because I have opposed discrimination. During this meeting Mr. Banks acknowledged that I raised issues of hostile treatment by Mr. Mazza to him on four occasions. During this meeting, Mr. Banks continued to be rude and demeaning in the presence of Julie Addy, to the point where I chose to dismiss myself from this abusive treatment. Subsequently, on my November 2, 2015

performance dialog Mr. Banks downgraded my previous rating to a 4, when he never before had rated me below a 5. I believe I received a lower rating on my performance evaluation because I openly opposed discrimination, on record, in the presence of human resources.

5.     On or around November 14, 2015 I formalized an internal complaint of gender-based discrimination, based on the discriminatory environment perpetrated by managers Rick Banks and Jim Mazza. Specifically, I complained that female employees in Respondent's work place are denied promotional opportunities, equal pay and subjected to a hostile work environment because of their gender.

6.     My internal complaint failed to be investigated in accordance with Respondent's rules. My complaint was not kept confidential and, was in fact, disseminated to non-interested parties throughout January 2016 until present. I believe that my complaint was not handled correctly, as per Respondent's procedures, because I am female and because I opposed discrimination.

7.     My position has been evaluated as a "Band II". Those who have similar level of responsibilities and a similar (or fewer) number of direct reports are evaluated as a "Band I" or higher. I have requested repeatedly to have my salary increased and job title reclassified. This has been refused with the last denial occurring January of 2016. I asked for the job comparisons reviewed to support this decision and was denied this information. As a result, I am being paid lower than men in my Division who have similar (or lesser) level of program responsibilities and supervisory responsibilities. I believe that I was denied a reevaluation to Band I, and have been paid lower than men in similar positions, because I am female and because I opposed discrimination.

8.     Starting April 2016 and immediately after the results of my complaint were dissemination, all budget meetings have been cancelled at the direction of the VP of AAD Fred Van Sickle "until further notice." These budget planning meetings were central to my job responsibilities; I am now being prevented from performing a major part of my job and doing so has diminished my expertise and authority in the organization. I believed these were retaliatory actions for my filing a formal internal complaint with Respondent.

9.     On or around July 18, 2016 I was not selected for the position of Associate Vice President of Operations. I believe I was the most qualified applicant and that I did not receive the position because I filed an internal complaint of discrimination with Respondent.

Based on the foregoing, I charge respondent with an unlawful discriminatory practice relating to employment because of sex, opposed discrimination/retaliation, in violation of the New York State Human Rights Law (Executive Law, Article 15), Section 296.

I also charge the above-named respondent with violating Title VII of the Civil Rights Act of 1964, as amended (covers race, color, creed, national origin, sex relating to employment). I hereby authorize SDHR to accept this verified complaint on behalf of the U.S. Equal Employment Opportunity Commission (EEOC) subject to the statutory limitations contained in the aforementioned law(s).

-2-

I have not commenced any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

_____
Julie Featherstone

STATE OF NEW YORK  )
                   )  SS:
COUNTY OF          )

Julie Featherstone, being duly sworn, deposes and says: that he/she is the complainant herein; that he/she has read (or had read to him or her) the foregoing complaint and knows the content thereof; that the same is true of his/her own knowledge except as to the matters therein stated on information and belief; and that as to those matters, he/she believes the same to be true.

_____
Julie Featherstone

Subscribed and sworn to
before me this 2l  day
of  July        , 20 16

_____
Signature of Notary Public

MARY JO BEAMISH
Notary Public, State of New York
No. 01BE495335
Qualified in Onondaga County
Commission Expires July 10, 20 1̶7̶

- 3 -

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:   **Julie Featherstone**
      **1374 Stone Creek Lane #108**
      **Charlottesville, VA 22902**

From:   **New York District Office**
        **33 Whitehall Street**
        **5th Floor**
        **New York, NY 10004**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2016-02909 | Holly M. Woodyard, State & Local Program Manager | (212) 336-3643 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]   Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

**Kevin J. Berry,**
**District Director**

Feb 21, 2017
*(Date Mailed)*

Enclosures(s)

# FACTS ABOUT FILING
# AN EMPLOYMENT DISCRIMINATION SUIT
# IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. However you should contact the court directly if you have questions where to file your lawsuit. New York State has four federal districts:

- The United States District Court for the Southern District of New York is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester. (212) 805-0136 http://www.nysd.uscourts.gov

- The United States District Court for the Eastern District of New York is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk. (718) 613-2600 http://www.nyed.uscourts.gov

- The United States District Court for the Western District of New York is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates. (716) 551-4211 http://www.nywd.uscourts.gov

- The United States District Court for the Northern District of New York is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneida, Onandaga, Oswego, Ostego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's *Pro Se* Attorney has offices at 10 Broad Street in Utica New York. (315) 234-8500 http://www.nynd.uscourts.gov

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within 90 days of the date you receive the enclosed EEOC Notice of Right To Sue. Otherwise, you will have lost your right to sue.

(Over)

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit. You may file a complaint in federal court without a lawyer which is called a *Pro Se* complaint. Every district court has either a clerk or a staff attorney who can assist you in filing *Pro Se*. To find out how to file a *Pro Se* complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may very from district to district.

You may, however, wish to retain a lawyer if you chose. Whether you retain a private attorney, or file *Pro Se*, <u>you must file your suit in the appropriate court within 90 days of receiving this mailing</u>.

## WHAT IF I WANT A LAWYER BUT CAN'T AFFORD ONE?

If you can't afford a lawyer, the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer. You must file papers with the court requesting the appointment of counsel. You should consult with the office of the district court that assists *Pro Se* complainants for specific instructions on how to seek counsel. The appointment of counsel in any *Pro Se* complaint is always at the discretion of the court.

Generally, the U.S. District Court charges a $350.00 filing fee to commence a lawsuit. However, the court may waive the filing fee if you cannot afford to pay it. You should ask the office of the District Court that assists *Pro Se* complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may be of assistance to you in finding a lawyer to assist you in ascertaining and asserting your legal rights:

American Bar Association
(800) 285-2221
www.abanet.org

New York City Bar
Legal Referral Service
(212) 626-7373

New York State Bar Association
(800) 342-3661
www.nysba.org

National Employment Lawyers Association
Referral Service
(212) 819-9450
http://www.nelany.com/EN

Other local Bar Associations in your area may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge file to be destroyed after 2 years from the date of a determination, but time frames may vary. If you file a suit, and wish to request a copy of your investigative file, you or your attorney should make the request in writing as soon as possible. If you file suit, you or your attorney should also notify this office when the lawsuit is resolved.